UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES RAYMOND, MARK LEE and JOSEPH LILLARD,<br><br>                                              Plaintiffs,<br><br>- against -<br><br>MID-BRONX HAULAGE CORP., and ARNOLD SIRICO,<br><br>                                              Defendants. | Docket No.: 15-cv-05803 (RJS)<br><br>**DECLARATION OF JACK NEWHOUSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

JACK L. NEWHOUSE, an attorney duly admitted to practice law in the District of New Jersey, hereby affirms under the penalties of perjury that:

1. I am an associate with the law firm of Virginia and Ambinder, LLP, counsel to the Plaintiffs and the putative class in this action (hereinafter "Plaintiffs"). I submit this declaration in opposition of Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

2. I am fully familiar with the facts and circumstances contained herein.

3. The below relevant facts are based on evidence submitted in support of Defendants motion for summary judgment, the declarations of Plaintiffs James Raymond, Mark Lee, and Joseph Lillard, in addition to the following Exhibits annexed hereto:

   a. Exhibit A: A true and accurate copy of Mid-Bronx's Federal Motor Carrier Safety Administration ("FMCSA") Company Snapshot from the U.S. Department of Transportation's ("USDOT") website as of August 29, 2016, *available at* https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&original_query_param=NAME&query_string=1429217&original_query_string=MID%20BRONX%20HAULAGE%20CORP ("Company Snapshot").

   b. Exhibit B: A true and accurate copy of the FMCSA guide to whether a carrier needs a USDOT number, available at, https://www.fmcsa.dot.gov/registration/do-i-need-usdot-number. ("FMCSA DOT Number Guide")

1

    c. Exhibit C: A true and accurate copy of an undated letter from Vincent Verrilli to Mid-Bronx's counsel, Bates No. 44201, which was produced during discovery on April 29, 2016 ("Verrilli Letter").

    d. Exhibit D: Defendants' responses to Plaintiffs' interrogatory demands.

    e. Exhibit E: Plaintiffs' Notice of Deposition.

    f. Exhibit F: Defendants' Rule 26(a) disclosures.

    g. Exhibit G: A copy of the unpublished decision *Chaohui Tang v. Wing Keung Enters.*, 2016 US.Dist.LEXIS 90455, *18 (E.D.N.Y. 2016).

## RELEVANT FACTS

### I. Mid-Bronx Intrastate Carrier Classification

4. Mid-Bronx operates a localized intrastate waste collection service for customers operating almost entirely within the Bronx, New York. [Ex. A (Company Snapshot), at p. 2, Declaration of James Raymond (Raymond Decl.) ¶ 5; Declaration of Mark Lee (Lee Decl.) ¶ 5; Declaration of Joseph Lillard (Lillard Decl.) ¶ 4].

5. There are three types of carriers that are required to register with the Federal Motor Carrier Safety Administration (FMCSA) and obtain a U.S. Department of Transportation ("USDOT") identification number. First, carriers operating vehicles that are more the 10,000 pounds and are involved in interstate commerce. Second, carriers operating vehicles within a single state but are engaged in the transportation of hazardous materials. Third, carriers operating vehicles exclusively within a single state, where the state has adopted the USDOT's safety regulations. [Ex. B (FMCSA DOT Number Guide); 49 C.F.R. § 390.3(a) and (g)]. New York State has adopted the USDOT's safety regulations. *See* 17 NYCRR §§ 820.1, 820.13.

6. On the FMCSA registration form, a carrier is required to classify its operation as either (1) "interstate," (2) "intrastate only (HM)," and (3) "intrastate only (Non-HM)." [Ex. A

2

(Company Snapshot), at p. 2]. According to Mid-Bronx's registration information with the FMCSA, Mid-Bronx's Carrier Operation is "intrastate only (Non-HM)." [Ex. A (Company Snapshot), at p. 2]. As a result, although Mid-Bronx may follow the federal regulations, it is not because it is subject to the USDOT's jurisdiction, but because New York State requires Mid-Bronx to do so.

## II. **Plaintiffs Job Responsibilities**

7. Plaintiffs work for Mid-Bronx as garbage truck drivers, and are responsible for collecting waste from Mid-Bronx's customers. [Raymond Decl., ¶¶ 3-4; Lee Decl., ¶¶ 3-4; Lillard Decl., ¶¶ 2-4].

8. Once their truck is full, Plaintiffs drive the truck to one of two Bronx transfer stations, Metropolitan Transfer Station ("MTS") or Action Carting ("Action") (collectively MTS and Action are hereinafter referred to as the "Transfer Stations"), to dump the waste. [Raymond Decl., ¶ 8; Lee Decl., ¶ 8; Lillard Decl., ¶ 8].

9. Mid-Bronx uses these Bronx Transfer Stations because of their low dumping price. [Raymond Decl., ¶ 9].

10. Plaintiffs were assigned to a specific route, but had the discretion to determine the order by which they collect the waste from customer. [Deposition of Robert Stark ("Stark Dep.") annexed to the Declaration of Jael Dumornay ("Dumornay Decl.") as Exhibit G, at p. 69:16-19]. Plaintiffs also have the discretion to choose which Transfer Station to dump their waste. [Raymond Decl., ¶¶ 10-11; Lee Decl., ¶¶ 11-12; Lillard Decl., ¶¶ 9-10]. Typically, Plaintiffs dump their waste at the Transfer Station convenient to their route. [*Id.*].

11. The process for dumping waste by at the Transfer Stations is routinized for all waste collection firms. First, upon arriving, Plaintiffs usually wait on a line behind other garbage

trucks to dump their waste. [Raymond Decl., ¶¶ 12-15; Lee Decl., ¶¶ 10-13; Lillard Decl., ¶¶ 11-14]. Once it is Plaintiffs' turn to dump, they would drive the garbage truck onto a platform and dump the waste. [*Id*.]. At Action, the waste was dumped into a pit. [*Id*.]. At MTS, the waste was dumped onto a tipping floor. [*Id*.]. The waste dumped at the Transfer Stations by Plaintiffs was mixed with the waste previously dumped by other waste collection companies. [*Id*.]. Workers at the Transfer Stations would pull out scrap metal from the load for sale to scrap yards. [Lillard Decl., ¶ 15]. After dumping the waste, Plaintiffs would either continue on their route or drive back to Mid-Bronx's yard and end their shift. [Raymond Decl., ¶ 17; Lee Decl., ¶ 14; Lillard Decl., ¶ 17].

12. Plaintiffs never transported any waste or recyclables across state lines during their entire employment with Defendants. [Raymond Decl., ¶ 18; Lee Decl., ¶ 15; Lillard Decl., ¶ 18].

13. Because Plaintiffs determine whether to deliver waste to MTS or Action, MTS and Action do not know they will be handling Plaintiffs' waste until it arrives.

### III. The Journey of Waste Collected by Plaintiffs After it is Delivered to Action and MTS

#### a. Action

14. Waste delivered to Action is transported to various destinations within and outside New York State. [Ex. C (Verrilli Letter); Declaration of Vincent Verrilli ("Verrilli Decl."), ¶ 5; Dumornay Decl., Ex. E (Action Waste Reports), Bates Nos. MidBronx 1174-1181 (upon information and belief, the New York destinations include, but are not limited to, "COVHEMP – Covanta Hempstead"; "IESE – Sen – Seneca Meadows Landfill"; "TRIBORO – Triboro Fibers"; and "VISY – VISY.").

15. Between 2010 and 2015, Mid-Bronx delivered less waste to Action than Action transported within New York State. [Dumornay Decl., Ex. E (Action Waste Reports)].

16. According to Action's director of Legal Affairs and Chief Compliance Officer Frank Blandino, "no written contract, purchase order, or agreement exists between Action and Mid-Bronx." [Dumornay Decl., Ex. E, p. 1].

17. Defendants have not submitted any evidence from Action or an Action representative reflecting what occurs to the waste after it is delivered to Action, including (i) whether the waste was processed, (ii) how long the waste remained at Action before being transported elsewhere, (iii) who was responsible for handling the waste, (iv) who determined where the waste was going to be transported, (v) whether Mid-Bronx's waste was commingled with the waste of other carting companies, (vi) how the waste was transported to its subsequent destination, and (vii) the final destination of the waste collected by Plaintiffs.

18. Because waste delivered to Action is subsequently transported to both interstate and intrastate locations, it is possible for any piece of waste collected by Plaintiffs to have been transported to a location within New York State.

### b. MTS

19. Once waste is delivered to MTS, it is entirely within MTS's control. Waste delivered to MTS is shipped out by truck or train by MTS. [Verrilli Decl., ¶¶ 6, 7]. MTS coordinates the transportation of waste from its facility to the subsequent disposal site. [*Id*.]. The subsequent disposal site is determined by MTS, pursuant to contracts between MTS and the disposal site. [Verrilli Decl., ¶ 6].

20. There is no evidence in the record reflecting the specific destination of waste transported from MTS. MTS, however, acknowledges that it "cannot state the ultimate disposal location of each delivery made by Mid-Bronx during the period of June 2009 to the present." [Ex. C (Verrilli Letter)].

21. According to MTS's President, Vincent Verrilli, "when asked MTS has advised its customers that in excess of 85% of all waste and recycling materials delivered to MTS are transported out of New York State or internationally." [Verrilli Decl., ¶ 5]. Verrilli does not indicate the time period when this percentage applies or how this percentage was determined. Other than Verrilli's representation as to what he "advises" MTS's customers "when asked" where waste is transported to from MTS, there is no other evidence in the record that suggests waste is transported from MTS to an interstate destination.

22. Because waste delivered to MTS is subsequently transported to both interstate and intrastate locations, it is possible for any piece of waste collected by Plaintiffs to have been transported to a location within New York State.

### IV. Mid-Bronx's Relationship to the Waste After it is Delivered to Action or MTS

23. After the waste is delivered to the Transfer Stations, Mid-Bronx's connection to the waste comes to an end. Mid-Bronx put forth Robert Stark, Mid-Bronx's night supervisor, as its Fed. R. Civ. P. 30(b)(6) corporate representative on this issue, and he testified as follows:

> Q: Once the waste is transported to the transfer stations, MTS and Action, what is Action's [sic] involvement with that waste that was just delivered?
> A: I don't know what they do with it.
> Q: But does Mid-Bronx have any involvement with it or any control over it?
> A: Not to my knowledge.
> Q: Does Mid-Bronx have any monetary interest in what happens to that waste?
> A: As far as I know, no.

[Dumornay Decl., Ex. G (Stark Dep.), p. 89:3-17].

24. Mid-Bronx did not know whether they had to pay the Transfer Stations to accept the waste, whether the waste was processed after it was delivered to the Transfer Stations, how long the waste stays at the Transfer Stations, whether it was commingled with other waste, how the waste is transported from the Transfer Stations to its next destination, or who decides what

6

happens to the waste after it is delivered to the Transfer Stations. [Stark Dep., pp. 91:8-10, 93:13-94:7, 98:15-99:4].

25. Even if Mid-Bronx intends for waste collected by Plaintiffs to be transported out of New York State, it is possible that the waste is not transported out-of-state. [*See supra*, at ¶¶ 18, 22].

**V. Defendants' Failure to Disclose Material Information and Identity of Witnesses**

26. Defendants omitted the identity of key witnesses in their Fed. R. Civ. P. 26(a) disclosures and in response to Plaintiffs' interrogatory demands.

27. Plaintiffs' interrogatories request that Defendants identify each individual with knowledge of what happens to the waste after it is delivered to the Transfer Stations, including the identity of each destination the waste is transported to. [Ex. D (Interrogatory No. 6)].

28. In response, Defendants stated "officials at the [Action] and [MTS] may have knowledge concerning where the waste . . . delivered to [Action] and [MTS] is processed after delivery by Mid-Bronx employees." [*Id.*]. To date, Defendants have not served Plaintiffs with supplemental interrogatory responses identifying the specific names of any additional witnesses.

29. Plaintiffs also sought to depose a corporate representative from Mid-Bronx, pursuant to Rule 30(b)(6), on the following specified matters: (1) "description of the factual basis for Defendant's affirmative defense that Plaintiffs are exempt from overtime compensation pursuant to the Motor Carrier's Act exemption," (2) "Defendant's practice of transporting waste and/or recyclables outside the state of New Jersey (*sic*)," and (3) "what occurs to the waste and/or recyclables after it is delivered to the transfer stations by Plaintiffs." [Ex. E (Notice of Deposition)].

30. Mid-Bronx put forth Robert Stark, who did not possess any knowledge about the

7

ultimate destination of Mid-Bronx waste after being dumped at the Transfer Stations. [*See supra*, at ¶¶ 23-24].

31. On the instant motion for summary judgment, Defendants submit the declaration of a non-party Vincent Verrilli who can only generally attest to the transportation of waste from MTS. [*see generally* Verrilli Decl.].

32. Defendants also submit the declaration of Defendant Arnold Sirico who makes numerous conclusory and unsubstantiated representations regarding the interstate transportation of waste, such as: (1) "The waste and recycling materials collected by mid-Bronx in New York State is regularly and intentionally shipped out of New York State and internationally." [Sirico Decl., ¶ 4]; (2) "Mid-Bronx is one branch in a continuous stream of freight moving the waste . . . collected by Mid-Bronx out of New York State," [Sirico Decl., ¶ 10]; (3) Mid-Bronx intentionally delivered waste to MTS and Action because the materials delivered to these stations are transported out of New York, [Sirico Decl., ¶¶ 10, 11, 15]; (4) it is well known that waste delivered to MTS and Action is transported out of New York for disposal, [Sirico Decl., ¶¶ 11, 13]; and (5) on "numerous occasions" Sirico spoke with representatives of MTS (Vincent Verrilli) and Action (Greg Galietti) who informed him that the waste delivered to their transfer stations is transported out of state, [Sirico Decl., ¶¶ 12, 14].

33. Defendants failed to identify Vincent Verrilli or Greg Galietti as witnesses in their Rule 26(a) initial disclosures or in their interrogatory responses. [Exs. E (Interrogatory No. 6), F (Defendants' Rule 26 Disclosures)].

34. Although Arnold Sirico was identified in Defendants' initial disclosures as an individual with knowledge of the "end destination of Mid-Bronx's garbage," he too was not identified by Defendants in their interrogatory responses as an individual with knowledge of

where waste is transported to from the Transfer Stations. [*Id.*]. Sirico also was not put forth as Mid-Bronx's corporate representative on this issue. As a result of these material omissions, Plaintiffs had no reason to believe that Sirico had any additional knowledge above and beyond Mid-Bronx's corporate representative, and was therefore not noticed for deposition.

### VI.     Defendant Arnold Sirico Employed Plaintiffs

35.     Defendant Arnold Sirico is the "owner" of Mid-Bronx and is referred to as "the boss." [Stark Dep., pp. 13:24; 14:2; 119:9-12].

36.     **Sirico had the authority to hire and fire his employees**: Sirico hired Plaintiff Stark, the "supervisor." [Stark Dep., pp. 13:22-5; 14:2]. Sirico fired Plaintiff Raymond. [Raymond Decl., ¶ 19]. In addition, Sirico generally exercised plenary power over hiring and firing Mid-Bronx employees, and any final hiring or firing decisions required Sirico's permission. [Stark Dep., 25:8-25; 51:23-25; 52:2-5]. Except for in emergency situations, Robert Stark did not have authority to hire someone for Mid-Bronx. [Stark Dep., 25:13-25].

37.     Sirico made final determinations regarding the implementation of disciplinary actions against employees. [Stark Dep., 26:19-21].

38.     **Sirico supervised and controlled his employees' work schedules**: Sirico had the authority to alter the driver-employees' respective trucking routes and participated in making decisions regarding the routes employees drove. [Stark Dep., pp. 67:22-5; 68:2-6; Raymond Decl., ¶ 23]. For example, in 2015, Sirico informed Plaintiff Raymond that he was changing Raymond's route and pairing him with a new partner. [Raymond Decl., ¶ 23].

39.     Although Robert Stark was involved in coordinating routes, Stark could not make significant changes to the Mid-Bronx's trucking routes without Sirico's permission. [Stark Dep., 68:2-13].

40. If Mid-Bronx employees have complaints regarding the hours they work, they do not complain to Robert Stark, they complain to "the boss," Arnold Sirico. [Stark Dep., p. 119:6-12].

41. When Plaintiff Lee requested vacation time, he was directed by Robert Stark to meet with Sirico, who then determined whether or not to grant the request. [Lee Decl., ¶ 18]. Similarly, when Plaintiff Lillard wanted to get reimbursed for unused vacation days, he has been told by Robert Stark that Lillard needs permission from Arnold Sirico. [Lillard Decl., ¶ 20].

42. **Sirico did exercise authority over employees' rate and method of pay**: Sirico signed employees' paychecks throughout the relevant period. [Lee Decl., ¶ 17; Raymond Decl., ¶ 19; Lillard Decl., ¶ 19]. Sirico met with employees to discuss their complaints regarding their rate of pay. [Lee Decl., ¶ 16; Raymond Decl., ¶ 19]. Sirico denied Plaintiff Raymond's request to be compensated for overtime. [Raymond Decl., ¶¶ 21-22]. Sirico signed the collective bargaining agreement, authorizing the implementation of the negotiated terms and conditions within the CBA, including wage rates.

**WHEREFORE**, Plaintiffs respectfully request this Court deny Defendants' motion for summary judgment, and for such further relief as this Court deems just and proper.

Dated: New York, New York
August 29, 2016

_____/s/_____
Jack Newhouse, Esq.