UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————

No. 15 Civ. 5803 (RJS)

———————————————

JAMES RAYMOND, MARK LEE, AND JOSEPH LILLARD,

Plaintiffs,

VERSUS

MID-BRONX HAULAGE CORP. AND ARNOLD SIRICO,

Defendants.

———————————————

OPINION AND ORDER
March 31, 2017

———————————————

RICHARD J. SULLIVAN, District Judge:

Plaintiffs James Raymond, Mark Lee, and Joseph Lillard bring this action against their employers, Mid-Bronx Haulage Corporation ("Mid-Bronx") and Arnold Sirico, alleging that Mid-Bronx improperly withheld overtime and other compensation as required by federal and state wage and hour laws. Now before the Court is Defendants' motion for summary judgment on the grounds that Mid-Bronx is exempt from federal, state, and local overtime requirements and that Sirico is not an employer under state or federal law. Also before the Court is Plaintiffs' request for sanctions against Defendants for alleged violations of the federal rules governing discovery. For the reasons that follow, Defendants' motion for summary judgment is denied, and Plaintiffs' request for sanctions is granted in part and denied in part.

I. BACKGROUND

A. Facts

Plaintiffs are current and former drivers who work or worked night shifts for Mid-Bronx, a New York commercial carting company that collects and disposes of garbage and recycled materials.[1] (Def. 56.1

---

[1] The following facts are drawn from Defendants' Local Civil Rule 56.1 Statement (Doc. No. 50 ("Def. 56.1")) and Plaintiffs' Local Civil Rule 56.1 Counter-Statement (Doc. No. 62 ("Pl. 56.1")). Unless otherwise noted, where only one party's 56.1 Statement or Counter-Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely

¶¶ 1, 3–5, 68, 73, 77.) Mid-Bronx serves approximately 2,300 customers throughout New York City and operates a fleet of both "packer" trucks, which are used to pick up commercial waste, and "roll-off" trucks, which are used to pick up recycling and cardboard. (*Id.* ¶¶ 8–10, 12.) Plaintiffs all drove packer trucks picking up garbage on specified garbage routes. (*Id.* ¶¶ 69, 74, 78.) Mid-Bronx is registered with the United States Department of Transportation ("DOT") Federal Motor Carrier Safety Administration, which inspects Mid-Bronx vehicles for safety issues and assigns Mid-Bronx a number that is displayed on each of its trucks. (*Id.* ¶¶ 15–18.)

Mid-Bronx directs its drivers to deliver materials they collect within New York City to one of two putrescible waste transfer stations: Metropolitan Transfer Station ("Metropolitan") and Action Environmental Group ("Action"). (*Id.* ¶ 66.) Both Metropolitan and Action are located within New York State. (Doc. No. 59 ("Raymond Decl.") ¶ 8; Doc. No. 60 ("Lee Decl.") ¶ 8; Doc. No. 61 ("Lillard Decl.") ¶ 8.) Once Mid-Bronx employees deliver materials to Metropolitan or Action, the materials are intermixed with materials received from other hauling companies. (Raymond Decl. ¶¶ 13–15; Lee Decl. ¶¶ 11–13; Lillard Decl. ¶¶ 12–14.) Action and Metropolitan then separate scrap metal from other materials in order to sell it. (Lillard Decl. ¶¶ 15–16.) The materials are then weighed, sorted, and transported to a disposal site. (Doc. No. 49 ("Verrilli Decl.") ¶ 6.) Metropolitan ultimately transports at least 85% of the materials it receives to out-of-state or international locations (*id.* ¶¶ 4–5), and Action transports a substantial portion of the waste it receives out of state (Doc. No. 45 ("First Dumornay Decl.") Ex. E; Doc. No. 47 ("Sirico Decl.") ¶ 16).

Arnold Sirico is "an owner and President" of Mid-Bronx (Sirico Decl. ¶ 5) and is the signatory on Plaintiffs' checks (Pl. 56.1 ¶ 29). Sirico represents Mid-Bronx in negotiations with Private Sanitation Union Local 813, International Brotherhood of Teamsters ("Local 813"), which represents drivers employed by Mid-Bronx and has a collective bargaining agreement with Mid-Bronx that sets the terms and conditions of their employment. (*Id.* ¶¶ 21–22; Sirico Decl. ¶ 5). In 1996, Sirico hired Robert Stark, the Mid-Bronx Supervisor and Night Foreman, who is responsible for the supervision of Mid-Bronx's night shift drivers and shares joint responsibility for staffing drivers for the night shift, coordinating routes, assigning routes and stops, and recommending the hiring of drivers. (First Dumornay Decl. Ex. G ("Stark Dep.") at 13:22–14:2; Def. 56.1 ¶¶ 27–31.) Stark also makes hiring and disciplinary recommendations to Sirico (Stark Decl. ¶ 4), but except in the case of an emergency, all hiring and firing decisions require approval from Sirico (Stark Dep. at 25:8–25). Plaintiffs occasionally discussed matters involving their overtime pay, vacation, and compensation for unused vacation time with Sirico. (Lillard Decl. ¶ 20; Lee Decl. ¶¶ 16, 18.)

B. Procedural History

Plaintiffs initiated this action on July 23, 2015, bringing claims for failure to pay overtime compensation in violation of the

---

objects to inferences drawn from that fact. In resolving the motions, the Court also considered Defendants' memorandum of law in support of its motion for summary judgment (Doc. No. 51 ("Mem.")), Plaintiffs' memorandum of law in opposition to the motion for summary judgement (Doc. No. 57 ("Opp.")), Defendants' reply brief (Doc. No. 70 ("Reply")), and the documents submitted in support thereof (Doc Nos. 45–49, 54, 58–61, 69).

Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207 and 216(b), New York Labor Law ("NYLL") § 663, and New York Codes, Rules and Regulations ("NYCCR") § 142-2.2. (Doc. No. 1.) Plaintiffs amended their complaint on August 25, 2015 (Doc. No. 8) and on January 5, 2016 (Doc. No. 23), and Defendants answered the second amended complaint on January 15, 2016 (Doc. No. 25). The parties then proceeded to discovery, which concluded on May 20, 2016. (Doc. No. 29.)

On July 22, 2016, Defendants filed the instant motion seeking summary judgment on the grounds that (1) Defendants are exempt from the overtime requirements of the FLSA, NYLL, and NYCCR because they fall within the Motor Carrier Act exemption to the FLSA, and (2) Sirico is not an employer for the purposes of the FLSA, NYLL, or NYCCR. (Doc. No. 51.) In their opposition brief filed August 29, 2016, Plaintiffs also asked the Court to sanction Defendants for omitting two witnesses from their initial disclosures and for failing to produce an adequate corporate representative for Mid-Bronx in violation of Federal Rules of Civil Procedure 26(a) and 30(b)(6). (Doc. No. 57.) The motion was fully briefed by September 15, 2016. (Doc. No. 70.)

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

3

### III. DISCUSSION

#### A. The Motor Carrier Act Exemption

The FLSA requires employers to pay overtime wages to certain employees who work more than forty hours in a week. 29 U.S.C. § 207. However, the FLSA is subject to certain exemptions, including the Motor Carrier Act exemption (the "MCA exemption"), which exempts motor private carriers for whom the Secretary of Transportation may prescribe requirements for qualifications and maximum hours of service when needed to promote safety of operations under 49 U.S.C. § 31502. 29 U.S.C. § 213(b)(1). The parties do not dispute that Mid-Bronx is a "motor private carrier" as defined in 49 U.S.C. § 13102(15). However, the Secretary of Transportation only has jurisdiction over, and the MCA exemption only applies to, carriers engaged in the transportation of passengers, property, or both "between a place in . . . a State and a place in another State . . . [or] a State and another place in the same State through another State . . . ." 49 U.S.C. § 13501. Thus, to invoke the MCA exemption to the FLSA, Defendants must prove that Plaintiffs operated "motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA exemption]." *Cruz v. AAA Carting & Rubbish Removal, Inc.*, 116 F. Supp. 3d 232, 246 (S.D.N.Y. 2015). The parties dispute whether (1) garbage constitutes "property" for the purposes of the MCA exemption, and (2) Plaintiffs transported garbage in interstate commerce within the meaning of the MCA. Exemptions to the FLSA are "narrowly construed against the employers seeking to assert them and their application [is] limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). The employer has the burden of establishing its entitlement to such an exemption. *Id.* at 394 n.11; *see also Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991).

#### 1. Whether Garbage Constitutes "Property" Under the MCA Exemption

The DOT has not issued any regulations or formal guidance on whether garbage is property under the MCA exemption, nor has the Second Circuit had occasion to address the issue. *See Cruz*, 116 F. Supp. 3d at 246 n.6 (noting that "there is some dispute about whether garbage is property under the MCA"); *Park Ins. Co. v. Lugo*, No. 13-cv-03567 (LGS), 2014 WL 2453335, at *5 (S.D.N.Y. June 2, 2014) ("The term 'property' is not defined in the MCA, and case law appears to be silent on this point as well."). Courts have generally taken two approaches to the issue: some courts have concluded that, because the DOT has jurisdiction only over motor carriers that transport property, its exercise of jurisdiction over a defendant–garbage hauler must indicate that it considers garbage to be property. *See, e.g.*, *VanArtsdalen v. Deffenbaugh Indus., Inc.*, No. 09-2030-EFM, 2011 WL 1002027, at *3 (D. Kan. Mar. 18, 2011); *Graham v. Town & Country Disposal of W. Mo., Inc.*, 865 F. Supp. 2d 952, 957 (W.D. Mo. 2011). Other courts have looked to rulings from the Interstate Commerce Commission ("ICC"), which was disbanded in 1996, *see* ICC Termination Act of 1995, Pub. L. No. 104–88, § 101, 109 Stat. 803, 804 (1995), to conclude that garbage is not property for the purpose of the MCA exemption, *see, e.g.*, *Interstate Commerce Com. v. Browning-Ferris Indus., Inc.*, 529 F. Supp. 287 (N.D. Ala. 1981); *Wilson v. Iesi NY Corp.*, 444 F. Supp. 2d 298 (M.D. Pa. 2006); *Alice v. GCS, Inc.*, No. 05-c-50132, 2006 WL 2644958, (N.D. Ill.

4

Sept. 14, 2006); *Charlton v. Republic Servs. of Fla., Ltd. P'ship*, 2010 WL 2232677 (S.D. Fla. 2010).[2]

Here, the fact that Plaintiffs transported scrap metal, which has value because Action and Metropolitan sorted it from the garbage and sold it (Lillard Decl. ¶¶ 15–16), is enough for the Court to find that Plaintiffs transported property under either party's definition of property, *see Veney v. John W. Clarke, Inc.*, 28 F. Supp. 3d 435, 443 (D. Md. 2014) ("[d]efendants are able to sell recyclables collected from their commercial customers, so those items possess intrinsic economic value" and constitute property under the MCA exemption). But even if the materials hauled by Plaintiffs were limited to garbage without scrap metal, the Court would still find that garbage constitutes property for the purposes of the MCA exemption.

First, treating garbage as property, and thus subjecting garbage haulers to the jurisdiction of the Secretary of Transportation, accords with the ordinary meaning of "property." "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *BP America Production Co. v. Burton*, 549 U.S. 84, 91 (2006). The Restatement of Property defines property as "legal relations between persons with respect to a thing," where the "thing may be an object having physical existence." Restatement (First) of Property, div. I, intro. note (1936). The plain and ordinary meaning of "property" is simply "a bundle of rights, protected from interference by legal sanctions." *Miller v. C.I.R.*, 299 F.2d 706, 708 (2d Cir. 1962). Property does not necessarily connote value; "it also consists of 'the group of rights which the so-called owner exercises in his dominion of the physical thing,' such 'as the right to possess, use and dispose of it.'" *United States v. Gen. Motors Corp.*, 323 U.S. 373, 380 (1945); *see also Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998) (the "fundamental maxim of property law [is] that the owner of a property interest may dispose of all or part of that interest as he sees fit"). Thus, even if the garbage lacks inherent value, or possesses a negative value, it can hardly be disputed that Mid-Bronx exercised physical dominion over the garbage it collected and had discretion to choose where and how to dispose of it. Garbage thus falls within the plain and ordinary meaning of "property."

Second, the text and structure of the MCA exemption counsel in favor of considering garbage as property. The fact that Congress exempts heavier trucks (weighing more than 10,000 pounds) from the FLSA, but not lighter trucks, indicates that the type of goods being carried – as opposed to their size – is not dispositive, or even the most critical factor, in determining whether the Secretary of Transportation has jurisdiction. 49 U.S.C. § 31101. Moreover, the MCA excludes several miscellaneous items, such as wood chips, powdered glass, and decorative rocks, from the DOT's jurisdiction, s*ee* 49 U.S.C. § 13506, and it is reasonable to assume that Congress would have specifically included garbage in this list

---

[2] Significantly, the ICC's rulings have not been entirely consistent on this point. In one ruling, the ICC determined that rock and debris was not property under the MCA because it had a "negative value as a commodity." *Joray Trucking Corp. Common Carrier Application*, 99 M.C.C. 109 (1965). In another ruling on whether nuclear waste constituted "property," the ICC indicated that having a value, whether negative or positive, was not conclusive, but rather that "'property' connotes ownership as well as value. Something that is owned can be 'property' notwithstanding its lack of economic value." *Nuclear Diagnostic Labs., Inc. Contract Carrier Application*, 133 M.C.C. 578, 580 (1979).

if it intended to exclude it from the MCA exemption.

Finally, treating garbage as property accords with the purposes of the DOT and the MCA exemption to the FLSA, both of which were designed to promote safety on interstate highways. *See* 49 U.S.C. § 101 (purpose of DOT is to promote, *inter alia*, "fast, safe, efficient, and convenient transportation"); 49 U.S.C. § 31502(b)(2) (DOT may regulate motor carriers, and thus displace the FLSA, "when needed to promote safety of operation"); *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 677 (1947) (recognizing that the MCA exemption to the FLSA "puts safety first"). Transporting tons of garbage in 36,000 pound trucks (Def. 56.1 ¶ 11) implicates safety concerns not only because of the size of the trucks, but also because of the nature of garbage hauling and the putrescible and potentially hazardous waste being transported. For these reasons, Mid-Bronx drivers are responsible for ensuring their own safety and the safety of other motorists by performing safety inspections, wearing high-visibility clothing during their shifts, knowing and planning for hazards on their route, and examining materials collected for safety issues. (*Id.* ¶¶ 42–45, 50, 53, 55.) Even a cursory review of the safety issues implicated by Plaintiffs' routine work would squarely place garbage hauling within the purview of the MCA exemption. Treating garbage as property would thus "give effect to [the] congressional purpose" underlying the MCA exemption. *United States v. Al Kassar*, 660 F.3d 108, 125 (2d Cir. 2011) (quoting *Johnson v. United States*, 529 U.S. 694, 710 n.10 (2000)).

Based on the text, structure, and purpose of the MCA, the Court concludes that garbage constitutes property for the purposes of the MCA exemption to the FLSA.

2. Whether Plaintiffs Operate in Interstate Commerce

Of course, finding that garbage constitutes property under the MCA is not enough. The Court must also determine whether Plaintiffs transported that property in interstate commerce for the purposes of the MCA. As noted above, a carrier has travelled in interstate commerce if it transports property "between a place in . . . a State and a place in another State" or between "a State and another place in the same State through another State." 49 U.S.C. § 13501. However, the Second Circuit has also recognized that a purely intrastate carrier may meet the interstate commerce requirement of the MCA exemption "if the goods being transported within the borders of one State are involved in a 'practical continuity of movement' in the flow of interstate commerce." *Bilyou v. Dutchess Beer Dists., Inc.*, 300 F.3d 217, 223 (2d Cir. 2002) (quoting *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943)). Whether intrastate transportation is involved "in the flow of interstate commerce" is in turn determined by reference to "the intention formed prior to shipment, pursuant to which the property is carried to a selected destination by a continuous or unified movement." *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74 (2d Cir. 2001) (internal quotation marks and citations omitted); *see also Atl. Coast Line R. Co. v. Standard Oil Co. of Kentucky*, 275 U.S. 257, 269 (1927) (determining continuity of transportation by examining whether the destination of the goods "is arranged for or fixed in the minds of the sellers"). Thus, when determining whether intrastate shippers qualify for the MCA exemption, courts focus on whether the goods' final destination was known at the time they were shipped. *Walling*, 317 U.S. at 568.

In *Walling*, the Supreme Court held that intrastate shippers delivering goods that were first shipped from out of state qualified for the MCA exemption where the goods were "ordered pursuant to a pre-existing contract or understanding with the customer." *Id.* The Court explained that "[t]he contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate movement should terminate." *Id.* at 569. The Court contrasted such deliveries based on "prior orders or contracts" with deliveries "based on *anticipation* of needs of specific customers," holding that the latter constitutes interstate commerce within the meaning of the MCA only when the evidence demonstrates with "particularity" that the goods were meant for specific customers, as opposed to "goods acquired and held by a local merchant for local disposition." *Id.* at 570 (emphasis added). Applying this logic, Judge Mukasey concluded more than a decade ago that the MCA exemption does not apply when goods are "for future delivery to customers yet to be identified" or "where the final destination of any shipment is not decided until after the goods had come to rest in the warehouse." *Masson v. Ecolab, Inc.*, No. 04-cv-4488 (MBM), 2005 WL 2000133, at *6 (S.D.N.Y. Aug. 17, 2005) (internal quotation marks and citations omitted); *see also McGuiggan v. CPC Int'l, Inc.*, 84 F. Supp. 2d 470, 483 (S.D.N.Y. 2000) (MCA exemption applied to drivers who delivered English muffins, baked out of state, to intrastate customers pursuant to specific orders).

In *Bilyou*, the Second Circuit held that an intrastate beverage distributor met the MCA's interstate commerce requirement even when the empty bottles and recyclable materials that it collected were transported out of state by other interstate shippers. 300 F.3d at 219–20. In that case, Dutchess Beer Distributors, Inc. ("DBD") and the company that processed and arranged the out-of-state shipments were related entities with common owners, shared property, and shared proceeds and costs associated with the overall business. *Id.* at 225. That relationship, coupled with the fact that DBD intended a specific, out-of-state destination at the time the transport commenced, *id.* at 223–24, led the *Bilyou* court to conclude that DBD's intrastate drivers were nonetheless engaged in interstate commerce. The court noted that DBD paid a deposit on bottles it received from an out-of-state brewery and received preprinted invoices for the return of those empty bottles, *id.* at 220, so that "from the moment it receive[d] these products, DBD ha[d] a 'fixed and persisting intent' to return the refillable containers to out of state breweries," *id.* at 225 (quoting *Project Hope*, 250 F.3d at 74). Thus, the Second Circuit affirmed the holding of the district court, which held that the out-of-state brewery "remain[ed] involved with the product even after it has reached the DBD warehouse, such that the chain of commerce cannot reasonably be deemed broken." *Bilyou v. Dutchess Beer Distributors, Inc.*, No. 99-cv-4231 (CM), 2001 WL 286779, at *4 (S.D.N.Y. Mar. 9, 2001).

Not surprisingly, the handful of cases involving the transfer of garbage by intrastate haulers to transfer stations have consistently focused on the intrastate carrier's involvement in the transfer facility's decision regarding where to send the garbage. For example, in *Cruz v. AAA Carting*, an intrastate garbage hauling company tried to invoke the MCA exemption by arguing that the garbage and recyclables it transported were typically shipped out of state by the transfer station. 116 F. Supp. 3d at 250–51. A representative of the defendant–garbage hauler testified to its "understanding and intent" that the waste

7

be shipped out of state, and provided a list of transfer stations with notations indicating where the waste was eventually shipped. *Id.* at 250. Nevertheless, the plaintiffs in *Cruz* sought additional discovery, including AAA's contracts with transfer stations, to determine whether the defendant had a "specific out-of-state recipient in mind beyond the transfer station" to which it delivered waste. *Id.* at 238. Citing *Bilyou*, Judge Karas ultimately found that summary judgment was inappropriate since the requested discovery might create an issue of material fact as to whether "the intended final destination of the refuse transported by [p]laintiff was out of state[] at the time such transportation commenced." *Id.* at 251.

Similarly, in *Veney v. John W. Clarke, Inc.*, a district judge in Maryland concluded that the defendant–hauling company failed to demonstrate that it had a fixed and specific intent to ship waste out of state – even though the transfer station *did* ultimately ship the waste out of state – because the defendant "ma[de] no arrangements for what they dump[ed] to be transported out of state." 28 F. Supp. 3d at 444. The *Veney* court emphasized that "[d]efendant's transportation of property end[ed] at the dump," and that what happened to the trash and recyclables after that "is determined by someone else." *Id.* And in *Alice v. GCS, Inc.*, the district court held that a defendant failed to demonstrate "a fixed and persistent intent to transport the construction debris in interstate commerce," since the hauler could only show that it "intended to transport the waste to the [intrastate transfer station]," 2006 WL 2644958 at *5, which "alone determined where to transport the recyclable and non-recyclable waste," *id.* at *4. The *Alice* court also found that, because the transfer station "determined the final destination of the waste delivered [by defendant] only after it sorted, processed, and commingled the refuse with like-kind products and accumulated sufficient quantities of matter to constitute a full load," *id.* at *5, "the continuity of movement of the original product" in interstate commerce was sufficiently interrupted to disqualify the defendant for the MCA exemption, *id.* at *4.

In the face of this consistent authority, Defendants rely on an opinion from the Southern District of Indiana for the proposition that, contrary to the law discussed above, they need not establish that Mid-Bronx had a "specific, ultimate destination for the waste at the time of shipment." (Reply at 6 (citing *Craft v. Ray's, LLC*, No. 08-cv-627 (RLY) (JMS), 2009 WL 3163148, at *7 (S.D. Ind. Sept. 29, 2009), *amended on reconsideration,* No. 1:08-cv-627 (RLY) (JMS), 2010 WL 148306 (S.D. Ind. Jan. 13, 2010) (citing ICC Policy Statement, 8 I.C.C. 2d 470 (I.C.C. Apr. 27, 1992)).) However, that case and the policy statement from the now-defunct ICC that it cites are readily distinguishable. First, the defendant in *Craft* not only operated a trash- and recyclable-hauling service, but also owned the transfer stations that sold recyclable material to out-of-state manufacturers. *Craft*, 2009 WL 3163148 at *1. In this sense, *Craft* is much more like *Bilyou* than this case. *See id.* at *6 ("In *Bilyou* . . . the Second Circuit resolved a case very similar to the instant case."). Second, the defendant in *Craft* introduced evidence that in most cases purchase agreements for its recyclables were executed in advance and on a monthly basis, thus satisfying the Supreme Court's requirement of a "particularity" of evidence that the goods were meant for specific customers, *Walling*, 317 U.S. at 570, and proving that the waste's specific destination was "arranged for or fixed in the mind[] of the seller[]," *Bilyou*, 300 F.3d at 224 (quoting

8

*Atl. Coast Line*, 275 U.S. at 269). Third, the 1992 ICC policy statement relied on in *Craft* listed factors to help identify when intrastate shippers qualified as interstate carriers for the purposes of the MCA exemption. ICC Policy Statement, 8 I.C.C.2d at 470. None of the factors there apply to Mid-Bronx's business, and several appear to counsel against considering Mid-Bronx's intrastate activity as interstate traffic because they describe behavior that Mid-Bronx did not engage in. *See id.* at 473 ((1) "[the shipper] bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State"; (2) "[w]hile in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation"; (3) "[t]he shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier"; and (4) "[t]he warehouse utilized is owned by the shipper.") The Court therefore finds Defendants' reliance on *Craft* to be unpersuasive.

To be sure, Defendants have introduced evidence showing that the transfer stations to which Plaintiffs delivered waste, Metropolitan and Action, consistently transported most of the waste to out-of-state destinations. Specifically, Defendants introduced a declaration from Vincent Verrilli, the president of Metropolitan, stating that Metropolitan "made the intentional decision" to keep the materials delivered to it in the stream of interstate commerce and that at least 85% of all materials delivered to Metropolitan are transported out of state or internationally. (Verrilli Decl. ¶ 4–5.) Defendants also introduced less definite evidence indicating that a substantial portion of the waste delivered to Action is transported out of state. (First Dumornay Decl. Ex. E; Sirico Decl. ¶ 16.) However, at least some waste from both transfer stations remained in state, and Defendants have not provided any evidence regarding where the waste from Mid-Bronx was eventually shipped or how much was shipped out of state.

Defendants have also introduced somewhat conclusory testimony from Sirico indicating that Mid-Bronx instructed Plaintiffs to deliver waste to Metropolitan and Action because "Mid-Bronx wanted the materials which it delivered to remain in the stream of interstate commerce as this was a necessary requirement for the Motor Carrier Act exemption." (Sirico Decl. ¶ 15.) In essence, Sirico asserts that he specifically contracted with Metropolitan and Action in order to preserve the MCA exemption. To this end, Sirico testified that he spoke to representatives of Metropolitan and Action regarding where they ship materials to confirm that those materials went out of state. (*Id.* at ¶¶ 12, 14.) These facts, Defendant argues, establish that Mid-Bronx acted with a "persistent intent to place the waste its employees collect[ed] into interstate commerce" (Reply at 6), and that Mid-Bronx "maintained an interest in the waste after it was disposed" at Action and Metropolitan (*id.* at 7).

Viewed in a light most favorable to Plaintiffs, these facts are insufficient to award summary judgment to Defendants. Even if Sirico's conclusory statement is given full weight, the generalized intent that goods be transported anywhere, as long as it is another state, is not sufficient as a matter of law to satisfy the "particularity" of evidence requirement in *Walling*, 317 U.S. at 570, or to show that the waste's destination was "arranged for or fixed in the

9

mind[]" of Mid-Bronx, *Bilyou*, 300 F.3d at 224 (quoting *Atl. Coast Line R. Co.*, 275 U.S. at 269). What is more, the Defendants' Fed. R. Civ. P. 30(b)(6) representative on the issue of Mid-Bronx's interstate intentions – Robert Stark – testified that Mid-Bronx has no "involvement with," "control over," or "monetary interest in what happens to" waste after it is transported to the transfer stations (Stark Dep. at 89:3–17), and that it has been 20 years since he last spoke to anyone about where the waste collected by Mid-Bronx is transported after it is delivered to Metropolitan and Action (*id.* at 78:10–19). Given these facts, there is a genuine dispute of material fact as to whether Mid-Bronx intended that the waste be delivered to "an ultimate final destination [that] was envisaged at the time the transportation commenced." *Bilyou*, 300 F.3d at 224.

Nor have Defendants introduced sufficient evidence to show that the "final destination" of the waste was determined before it "had come to rest in the warehouse," or in this instance, the transfer station. *Masson*, 2005 WL 2000233 at *6 (internal quotation marks and citations omitted). Rather, Defendants have only shown that a substantial portion of the waste *eventually* travels out of state. While the declaration of Metropolitan's president indicates that Metropolitan has a pre-existing relationship with "contracted disposal sites," some of which are out of state (Verrilli Decl. ¶ 6), the declaration does not indicate on what basis a contracted disposal site is chosen, how many there are, or whether the ultimate destination of Mid-Bronx's garbage is known prior to its delivery to the transfer station.

Accordingly, in light of the factual disputes discussed above, the Court cannot conclude as a matter of law that Mid-Bronx meets the MCA exemption's interstate commerce requirement.

### B. Sirico's Status as an Employer

Plaintiffs have sued Arnold Sirico, an owner and President of Mid-Bronx, seeking to hold him individually liable for violations of the FLSA and NYLL as an "employer" under those statues. (*See* Second Amend Compl. ¶ 38; Opp. at 21–24.) In their motion, Defendants argue that Sirico had "no interaction with Plaintiffs and no involvement in their employment," and that Robert Stark, not Sirico, supervised them. (Mem. at 17.) Defendants thus urge the Court to conclude that Sirico is not an employer for the purposes of the FLSA and NYLL, grant summary judgment in their favor, and dismiss Plaintiffs' claims against Sirico. For the reasons set forth below, the Court finds that a genuine dispute of material fact exists as to whether Sirico is an employer under the FLSA and NYLL and therefore denies Defendants' summary judgment motion as it pertains to Sirico.

The FLSA creates liability for any "employer" who violates its terms. 29 U.S.C. §§ 207(a)(1), 216(b). Moreover, the FLSA defines "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d). "The definitions of the term 'employer' under the FLSA and NYLL are coextensive." *Jeong Woo Kim v. 511 E. 5th St., LLC*, 133 F. Supp. 3d 654, 665 (S.D.N.Y. 2015). To determine whether a party is an employer, courts apply the economic reality test, a "flexible" and "comprehensive" test meant to "give proper effect to the broad language of the FLSA." *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 143 (2d Cir. 2008). The relevant factors of the economic reality test include whether the alleged employer "(1)

had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984). "Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999); *see also Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) ("[A]n employer does not need to supervise or monitor the employees on a daily basis in order to exercise 'control' as understood by the FLSA").

With respect to the first factor, Plaintiffs have introduced evidence that Sirico hired Robert Stark, Plaintiffs' direct supervisor, in 1996 (Stark Dep. at 13:22–14:2), and fired Plaintiff James Raymond in 1985 (Raymond Decl. ¶ 19). Furthermore, Stark indicated that, except in the case of an emergency, Sirico exercised plenary power over all hiring and firing decisions (Stark Dep. at 25:8–25), a strong sign of his "power to hire and fire the employees." *Carter*, 735 F.2d at 12.

With regard to the second factor, Sirico also represented Mid-Bronx in negotiations with Local 813 (Sirico Decl. ¶ 5), with which Mid-Bronx has a collective bargaining agreement that sets the terms and conditions of employment for drivers (Def. 56.1 ¶ 22). Plaintiffs also introduced evidence that employees discussed complaints regarding their hours with Sirico, not Stark (Stark Dep. at 119:9–12 ("They don't complain to me. They complain to the boss.")), and that Sirico altered employees' routes and determined which stops various routes would include (i*d.* at 67:22–68:13).

There is thus ample evidence to suggest that Sirico "supervised and controlled employee work schedules or conditions of employment." *Carter*, 735 F.2d at 12.

With regard to the third factor – involving the determination of the rate and method of payment – Plaintiffs introduced evidence indicating that they discussed matters involving their overtime pay, vacation, and compensation for unused vacation time with Sirico. (Lillard Decl. ¶ 20; Lee Decl. ¶¶ 16, 18.) Additionally, Sirico signed Plaintiffs' checks (Lee Decl. ¶ 17), which is "[t]he key question" as to whether the third factor is satisfied, *Herman*, 172 F.3d at 140.

While there is little evidence that Sirico maintained employment records – the fourth factor – the law is clear that "[n]o one of the four factors standing alone is dispositive." *Id.* at 139. Rather, courts look to the "totality of the circumstances," including the extent to which the defendant exercised "operational control" over the plaintiffs' employment. *Id.* at 140. Given the evidence introduced with regard to the first three factors and the control Sirico exercised over Mid-Bronx's operation as a whole, Plaintiffs have demonstrated that there is at least a dispute of material fact as to Sirico's status as an employer under the FLSA and NYLL.

IV. PLAINTIFFS' DISCOVERY COMPLAINTS

In their opposition to Defendants' motion for summary judgment, Plaintiffs argue that Defendants "produced a wholly inadequate" Rule 30(b)(6) representative and failed to identify certain witnesses in their initial disclosures and interrogatory responses. (Opp. at 2–4.) Specifically, in a notice of deposition dated January 29, 2016, Plaintiff sought to depose a Mid-Bronx corporate representative regarding certain issues relating to Defendants' invocation of

the MCA exemption. (Doc. No. 58 ("Newhouse Decl.") Ex. E.) Mid-Bronx produced Robert Stark, who Plaintiffs now assert "did not possess any knowledge about what occurs to the waste after it is transported to the Transfer Stations," including Mid-Bronx's intended destination. (Opp. at 3.) Plaintiffs also argue that, in their motion for summary judgment, Defendants rely on two non-parties who were improperly excluded from their Rule 26(a) disclosures: Vincent Verrilli, president of Metropolitan, from whom a declaration was submitted, and Greg Galietti, a representative of Action, who is referenced in Sirico's declaration. (*Id.* at 5–6.) Plaintiffs urge the Court to strike the Verrilli declaration and certain paragraphs of the Sirico declaration or, alternatively, they ask that the Court grant a continuance to allow Plaintiffs to depose Sirico, Verrilli, and Galietti. (*Id.* at 6.)

With regard to the deposition of Robert Stark, the Court finds that Plaintiffs' objection is untimely. Specifically, Plaintiffs served the notice of deposition on January 29, 2016, requesting a deposition two months later, on March 29, 2016. (Newhouse Decl. Ex. E.) The deposition ultimately occurred almost two weeks later, on April 11, 2016 (Stark Dep.), and discovery did not close until May 20, 2016 (Doc. No. 29). Nevertheless, despite the fact that Stark's deposition revealed his apparent lack of knowledge, Plaintiffs did not bring the 30(b)(6) issue to the Court's attention until August 29, 2016, in summary judgment briefing. (Doc. No. 57.) Additionally, Plaintiffs' proposed alternative 30(b)(6) deponent, Sirico, is a named Defendant in this case and Plaintiffs were therefore on notice that he was in possession of relevant information since they filed the Complaint. Plaintiffs have thus failed to provide good reason why they did not bring the 30(b)(6) issue to the Court's attention during discovery, or why they should be given leave to depose Sirico after the close of discovery. *See Lastick v. Bahama Cruise Line, Inc.*, No. 88-cv-3624 (KC), 1990 WL 139023, at *4 (S.D.N.Y. Sept. 18, 1990) (denying request for additional depositions that could "have been noticed at a much earlier stage").

With respect to Plaintiffs' complaints regarding Defendants' 26(a) disclosures, the Court finds that good cause exists to continue discovery for the limited purpose of allowing Plaintiffs to depose Vincent Verrilli and Greg Galietti. Rule 26 provides that at the start of the case, parties must disclose

> the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]

Fed. R. Civ. P. 26(a)(1)(A)(i). These disclosures must be supplemented as new information comes to light. Fed. R. Civ. P. 26(e)(1). If a party does not identify a witness in the initial disclosures, that party is "not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). However, before precluding evidence, courts must consider:

> (1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet

12

the new testimony; and (4) the possibility of a continuance.

*Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (internal citation and quotation marks omitted) (alterations in original).

Defendants failed to disclose either Verrilli or Galietti in their Rule 26(a) disclosures despite (1) Sirico's claim in his declaration that he discussed information critically important to this case with each of them on "numerous occasions" (Sirico Decl., ¶¶ 12, 14), and (2) Defendants' attachment of a declaration from Verrilli as part of its summary judgment motion (Doc. No. 49). Defendants make no attempt to explain their failure to disclose these witnesses in discovery, but rather argue that any violation of Rule 26 was harmless since Plaintiffs were on notice that Mid-Bronx delivered garbage to Metropolitan and Action and because Defendants produced a letter from Verrilli during the course of discovery. (Reply at 2; Second Dumornay Decl. ¶ 12.) But while Plaintiffs obviously knew that Mid-Bronx delivered garbage to Action and Metropolitan, they had no way to know specifically that Verrilli and Galietti were in possession of relevant information relating to the MCA exemption or were potential witnesses for Defendants. And the fact that Defendants belatedly produced a one-page letter signed by Verrilli in a supplementary production on April 29, 2016, the day after discovery was initially scheduled to close, does little to refute Plaintiffs' claim that they were sandbagged.[3] The law is clear that a party's mere "knowledge of the existence of a witness does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is fulfilled only if [the disclosing party] informed [the opposing party] that it might call the witness." *Pal v. N.Y. Univ.*, No. 06-cv-5892 (PAC) (FM), 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008); *see also Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 72–73 (E.D.N.Y. 2012) ("the mere mention of a name in a deposition or interrogatory response is insufficient to satisfy Rule 26(a)(1)(A) . . . . Rather, to satisfy Rule 26, parties must make an unequivocal statement that they may rely upon an individual on a motion or at trial.")

Additionally, the testimony at issue is critically important to Defendants' case, and there is a clear risk of prejudice to Plaintiffs if they were to be prevented from deposing Verrilli and Galietti before trial. As noted above, Defendants rely primarily upon the declaration from Verrilli, and Sirico's conversations with both Verrilli and Galietti, to establish that Mid-Bronx's waste was transported in interstate commerce and that Mid-Bronx took steps to confirm the interstate destination of the garbage in question. (*See* Mem. at 3–4, 13–14; Reply at 5, 7.) Although the Court has denied Defendants' motion for summary judgment on that issue, Plaintiffs would likely be prejudiced at trial if they were unable to depose Verrilli or Galietti regarding the issue of interstate commerce.

Nevertheless, given the narrow scope of these issues and the availability of a brief and limited continuance, the Court finds that preclusion of evidence is unwarranted in this instance. *See Bastys v. Rothschild*, 154 F. App'x 260, 263 (2d Cir. 2005) ("the remedy of preclusion should be used sparingly"). Accordingly, the Court finds that good reason exists to re-open discovery for the sole purpose of allowing Plaintiffs to depose Verrilli and Galietti.

---

[3] The Court subsequently adjourned the close of discovery from until May 20, 2016. (Doc. Nos. 22, 29.)

13

## V. Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is DENIED. IT IS FURTHER ORDERED that Plaintiffs' request for discovery sanctions is GRANTED IN PART, and that discovery shall be reopened in this case for the limited purpose of allowing Plaintiffs to depose Vincent Verrilli and Greg Galietti. Those depositions must be completed by April 21, 2017. The Clerk of the Court is respectfully directed to terminate the motion pending at docket number 44.

Trial in this action will commence on May 30, 2017 at 9:30 a.m. in Courtroom 905 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The Court will set deadlines for pretrial submissions in a forthcoming order.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 31, 2017
  New York, New York

\* \* \*

James Raymond, Mark Lee, and Joseph Lillard are represented by Jack L. Newhouse, James E. Murphy, Suzanne B. Klein, and Lloyd R. Ambinder of Virginia & Ambinder LLP, 40 Broad Street, 7th Floor, New York, NY, 10004.

Mid-Bronx Haulage Corp. and Arnold Sirico are represented by Jonathan M. Bardavid of Trivella & Forte LLP, 1311 Mamaroneck Ave., Suite 170, White Plains, NY, 10605.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/17